# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRYAN MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13-CV-774-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Bryan Miller ("Miller"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Miller's application for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Miller appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Miller was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Miller was 54 years old at the time of the hearing before the ALJ on May 31, 2012. (R. 31-32). He had a high school diploma. *Id.* Miller had last worked in February 2010 as a plumber for an employer for whom he had worked for 35 years. (R. 32).

Miller testified that he had suffered three heart attacks and a bypass surgery. (R. 34). His doctor had given him a 50-pound lifting restriction after his February 2010 bypass surgery. *Id.* Miller said that he had non-cardiac pain in his chest when he attempted to lift a 50-pound bag of dog food. (R. 35). He said he had no pain when he lifted 20-25 pounds. (R. 35, 37). Miller said that he had previous surgery on his left arm, and he had been rated as having a 25% permanent disability in that arm. (R. 38-39).

Miller said that he could walk about 50 yards, and then he would be out of breath, and his hips and legs would hurt. (R. 37-38). He thought perhaps his hip pain was due to bone grafts done in connection with his arm surgery. (R. 38-39). Miller estimated that he could stand for about 25-30 minutes, and after that his legs would start feeling weak and numb. (R. 39). He had experienced lightheadedness and dizziness, but he had not fallen. *Id.* He could sit about 45 minutes. (R. 39-40). For example, during a church service he might have to get up to walk around. *Id.*

Miller said that he was compliant with his medications. (R. 40). He said that he had cut back his cigarette smoking from two packs a day to about half a pack. (R. 40-41).

Miller had a driver's license, but he could not drive far because his arms and hands would become numb. (R. 41). A family member had driven him to the hearing. *Id.* The farthest he had driven in the past year had been about 15 miles. (R. 41-42). Miller testified that he spent his day in a recliner watching television. (R. 42). His wife did most of the housecleaning, but he would help her. (R. 42-43). He loaded the dishwasher and folded clothes. (R. 43). He helped cook, but he would need to sit. *Id.* He mowed his lawn with a riding lawnmower, but he couldn't complete it at one time. *Id.* He would take breaks to rest and walk around. *Id.* He couldn't do the weed-eating, which would be done by another family member. (R. 45).

Miller had a handicapped parking placard. (R. 43-44). When he had requested it from the doctor, he had explained that after walking around inside the store, he would need to rest before being able to return to his car. *Id.*

Miller testified that he had not been prescribed a special diet. (R. 44). He testified that he ate the same foods, but now prepared them by a method other than frying. (R. 45). He cut back on items like eggs that were high in cholesterol. *Id.*

Miller testified that he would not be able to do his plumbing job, because it required lifting items like cast-iron pipes overhead. *Id.* Miller could not do that lifting due to his problems with his left arm and because his arms and hands would go numb. *Id.*

Miller could dress himself, but it would take longer, and he gave the example of putting on shoes and socks. (R. 45-46). Bending and stooping were difficult for him, and they caused him difficulty breathing. (R. 46). He no longer did household repairs, but instead a family member would do them. *Id.* His short-term memory problems would also affect his ability to do a job like plumbing. (R. 49-50).

Miller said that visitors, including his grandchildren, got on his nerves. (R. 46-47). He could not stand a lot of noise, including more than one or two people talking. (R. 47). He would feel jittery and leave to be by himself. *Id.* He had never done a lot of reading, but at the time of the hearing he had trouble reading due to problems with vision and concentration. *Id.* Miller would read the newspaper on the computer for 15 minutes. *Id.* When he watched television, he would change channels frequently, and he would have trouble paying attention to one television program from beginning to end. (R. 47-48). Trouble with his short-term memory also made it difficult to watch television. (R. 49-50). He said that he had lost interest in most hobbies. (R. 48).

Miller said that he could not fish or hunt any more because of his difficulty walking, especially over rough terrain. (R. 48-49). He was also scared of the possibility of having a heart attack at a remote location. *Id.* He used to camp almost all summer, but now he could only camp when a family member was available to set up his camper for him. (R. 49). Miller testified that he had camped for about six days one month before the hearing. (R. 51). During deer season the previous year, Miller had hunted one day during muzzle-loading season and two days during rifle season. (R. 51-52).

Miller presented to the emergency room at Jane Phillips Medical Center on February 1, 2010 with chest pain. (R. 249-63). He was transferred to St. John Medical Center and admitted the same day. (R. 265-93). A quintuple coronary artery bypass was completed February 2, 2010 by Robert C. Blankenship, M.D. *Id.* Final diagnoses on discharge were hypertension, dyslipidemia, and obesity, and Miller's prognosis was stated as fair to good. (R. 266).

Miller was referred to cardiac rehabilitation on March 1, 2010. (R. 248). An EKG on March 16, 2010 indicated sinus bradycardia. (R. 306-07). At Blue Stem Cardiology on March 31, 2010, Miller checked boxes indicating that he was experiencing swelling in his legs or arms, dizziness/faintness, and fatigue. (R. 333). An echocardiogram was completed March 31, 2010, and the reviewing physician's conclusions were that the left ventricular chamber was mildly dilated; there was basal inferior akinesis; the ejection fraction was 45%; and pulmonary artery pressure was 46 mmHg. (R. 297). The impressions of William P. Tinker, M.D., were coronary artery disease status post five-vessel bypass; hypertension; ischemic cardiomyopathy; suboptimal dyslipidemia; and ongoing tobacco abuse. (R. 308-09). The administrative record includes an unsigned letter with the names of both Dr. Tinker and a certified physician's assistant typed on it. (R. 313). The letter was for the purpose of obtaining an excuse from jury duty for Miller, and it

explained that he had a recent bypass surgery. *Id.* The letter stated that Miller was not fit for jury duty due to his physical state and mental issues of depression and anxiety. *Id.*

On April 16, 2010, Miller checked boxes indicating dizziness/faintness, fatigue, and depression/anxiety. (R. 335). Dr. Tinker's impressions were coronary artery disease status post five-vessel bypass; hypertension; ischemic cardiomyopathy; and high risk medications. (R. 310-11). He stated that he would complete disability paperwork after Miller had a functional evaluation. (R. 341).

On May 17, 2010, Miller checked boxes indicating that he was experiencing pain in his legs, restless legs, swelling in his legs or arms, dizziness/faintness, blurred vision, fatigue, and depression/anxiety. (R. 328). Dr. Tinker's impressions were coronary artery disease with ischemic cardiomyopathy with ejection fraction of 45%; hypertension; dyslipidemia; ongoing tobacco abuse; claudication; and depression. (R. 342-43). Dr. Tinker noted that Miller had not been able to afford the $1200 for a functional evaluation. (R. 342). An ultrasound of Miller's legs completed May 18, 2010 was normal. (R. 323).

On June 14, 2010, Miller checked boxes indicating that he was experiencing dizziness/faintness and fatigue. (R. 326). Dr. Tinker's impressions were coronary artery disease status post coronary artery bypass grafting; hypertension; dyslipidemia; ongoing tobacco abuse; and depression. (R. 368). The notes from the office visit stated that Miller had poor exercise tolerance, but he was not exerting himself. (R. 367). The notes also said that he was fatigued and exhausted. *Id.* Under the "Plan" heading, a note stated "I think he needs to exercise to get over this exercise intolerance." (R. 368).

Miller saw his primary care physician, Matthew L. West, M.D., on January 4, 2011 for a periodic follow-up. (R. 406). Dr. West's diagnoses were coronary artery disease; dyspnea on exertion; smoker; hypertension; high cholesterol; fatigue; and mood/adjustment disorder. *Id.*

Miller saw Anderson P. Mehrle, M.D., at Blue Stem Cardiology on July 20, 2011 with complaints of no energy and weekly episodes of fatigue and dizziness. (R. 449-50). He reported shortness of breath when walking. (R. 449). Dr. Mehrle's first impression was coronary artery disease with no angina. *Id.* His second impression was fatigue, no energy, no desire, and dizziness, and Dr. Mehrle stated that Miller might "be becoming too bradycardic." *Id.* Dr. Mehrle's third impression was wheezing and shortness of breath, and he noted that Miller might "be having effects of beta-blocker on his reactive airway disease or COPD [chronic obstructive pulmonary disease]." *Id.* He adjusted Miller's medications. *Id.*

Miller was seen for teletherapy by clinician Robert Blasdel of Grand Lake Mental Health Center as a new patient on October 14, 2011, and Miller was identified as meeting criteria for admission to services. (R. 485). Additional sessions with Blasdel took place on November 11, December 2, and December 13, 2011. (R. 479-84). An Integrated Psychosocial Assessment dated January 3, 2012 has Blasdel's electronic signature, and Axis I[1] diagnoses were stated as major depressive disorder, recurrent, without psychosis; and generalized anxiety disorder. (R. 455-77). Miller was prescribed Xanax and Lexapro on January 13, 2012 by Peteryne Miller, M.D., who repeated Miller's diagnoses as major depressive disorder, recurrent, without

---

[1] The multiaxial assessment system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

6

psychosis; and generalized anxiety disorder.[2] (R. 453-54). Miller saw Blasdel again January 31, 2012. (R. 496). Dr. Miller increased Miller's Effexor on February 10, 2012. (R. 494-95).

Miller saw Dr. Tinker at Blue Stem Cardiology on March 9, 2012, and his complaint of pain in his sternum on lifting was noted. (R. 489-90). Impressions were coronary artery disease status post bypass surgery doing well with no angina; obstructive sleep apnea; and sternal wound pain. (R. 489).

Dr. Mehrle signed a Physical Disability Parking Placard Application dated March 9, 2012. (R. 486). Boxes were checked stating that Miller could not walk 200 feet without stopping to rest and had functional limitations which were classified in severity as Class III or Class IV according to the standards set by the American Heart Association. *Id.*

On March 30, 2012, Dr. Miller and clinician Blasdel signed a form entitled "Medical Source Opinion of Ability to Do Work-Related Activities (Mental)." (R. 498-500). Of 13 listed activities, they indicated that Miller was markedly limited in five, moderately limited in one, and not significantly limited in the remaining seven. (R. 498-99). Regarding the one activity for which a moderate limitation was indicated, interaction with the public, they wrote that Miller was able to interact well with others for limited periods of time. (R. 499).

Agency consultant Maribeth Spanier, Ph.D., completed a mental status evaluation of Miller on August 17, 2010. (R. 372-79). Dr. Spanier described Miller's affect as "slightly despondent." (R. 378). She said that his concentration was "effortful but adequate." *Id.* Her assessment on Axis I was adjustment disorder with mixed emotional features, and she scored his

---

[2] Dr. Miller used numerical codes to express her diagnoses. These codes are from the International Classification of Diseases, 9th edition - Clinical Model coding system, and this is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994).

Global Assessment of Functioning ("GAF")[3] as 55. (R. 379). She stated that Miller's judgment was estimated to be adequate. *Id.*

Agency nonexamining consultant Cynthia Kampschaefer, Psy.D., completed a Psychiatric Review Technique form dated September 2, 2010, concluding that Miller's mental impairments were not severe. (R. 380-93). For Listing 12.04, Dr. Kampschaefer noted Miller's depressive syndrome. (R. 383). For the "Paragraph B Criteria,"[4] Dr. Kampschaefer indicated that Miller had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 390). In the "Consultant's Notes" portion of the form, Dr. Kampschaefer noted Miller's February 2010 bypass surgery and the June 2010 treating records showing depression and prescribing Lexapro. (R. 392). She summarized Dr. Spanier's

---

[3] The GAF score represents Axis V of the multiaxial assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning," and 51-60 reflects moderate symptoms or moderate difficulty in functioning. *Id.* Scores between 61-70 reflect "some mild symptoms" or "some difficulty" in functioning, but "generally functioning pretty well." *Id.* A score between 71 and 80 reflects symptoms that are transient and reactions to stressors with no more than slight impairment in functioning. *Id. See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

8

consultative examination report and Miller's activities of daily living. *Id.* She said that Miller could perform simple and complex tasks, could relate to coworkers and supervisors, could adapt, and could work with the general public. *Id.*

Agency nonexamining consultant Beth Klein, Ph.D., completed a second Psychiatric Review Technique form dated June 29, 2011, concluding that Miller's mental impairments were not severe. (R. 433-46). For the Paragraph B Criteria, Dr. Klein indicated that Miller had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 443). In the "Consultant's Notes" portion of the form, Dr. Klein noted Miller's February 2010 bypass surgery and the follow-up treating records. (R. 445). She summarized Dr. Spanier's consultative examination report and Miller's activities of daily living. *Id.* She said that Miller's mental impairment continued to be nonsevere. *Id.*

Nonexamining agency consultant Luther Woodcock, M.D., completed a Physical Residual Functional Capacity Assessment on September 30, 2010. (R. 394-401). Dr. Woodcock indicated that Miller could perform work at the "light" exertional level. (R. 395). In the section for narrative comments, Dr. Woodcock noted Miller's bypass surgery, March 2010 echocardiogram results, and other post-surgical follow-up office visits. (R. 395-96). He summarized Miller's activities of daily living. (R. 396). Dr. Woodcock found no postural, manipulative, visual, communicative, or environmental limitations. (R. 396-98).

**Procedural History**

Miller filed his applications for disability insurance benefits and supplemental security income benefits on April 21, 2010. (R. 144-47). He asserted onset of disability as of February 1, 2010. (R. 144). The applications were denied initially and on reconsideration. (R. 86-100). An

9

administrative hearing was held before ALJ Edmund C. Werre on May 31, 2012. (R. 26-59). By decision dated June 27, 2012, the ALJ found that Miller was not disabled. (R. 11-20). On October 29, 2013, the Appeals Council denied review. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

**Decision of the Administrative Law Judge**

In his decision, the ALJ found that Miller met insured status requirements through December 31, 2014. (R. 13). At Step One, the ALJ found that Miller had not engaged in any substantial gainful activity since his alleged onset date of February 1, 2010. *Id.* At Step Two, the ALJ found that Miller had severe impairments of coronary artery disease with five-vessel bypass grafting; status post remote left arm surgeries; and mixed adjustment disorder. *Id.* At Step Three, the ALJ found that Miller's impairments did not meet any Listing. (R. 14).

The ALJ found that Miller had the RFC to perform work at the light exertional level, with no overhead reaching with his left arm. (R. 15). He added mental limitations stating that Miller was able to understand, remember, and carry out simple and some complex instructions; was able to relate and interact with coworkers and supervisors on a work-related basis only; and should

have no or minimal interaction with the general public. *Id.* At Step Four, the ALJ determined that Miller could not return to past relevant work. (R. 18). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Miller could perform, taking into account his age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Miller was not disabled from February 1, 2010 through the date of his decision. (R. 19).

### Review

Miller's first argument on appeal is that the ALJ erred in his consideration of the treating physician opinion evidence. Plaintiff's Opening Brief, Dkt. #19, pp. 4-7. Miller's second argument is that the ALJ's credibility assessment was flawed. *Id.*, pp. 4, 7-10. The Court agrees that the ALJ's credibility assessment was not in compliance with legal requirements. For this reason, the decision is **REVERSED AND REMANDED**.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary*, 695 F.3d at 1167.

The first flaw in the ALJ's credibility assessment was that it focused on whether Miller's pain was disabling. (R. 17-18). This focus was erroneous because Miller did not make claims of disabling pain. Instead, Miller gave some testimony of pain when lifting and walking, but his testimony primarily was directed at his need to rest during exertion. (R. 35-39, 43-44). He also

testified to weakness and numbness in his extremities. *Id.* Thus, several of the reasons the ALJ gave for finding Miller less than fully credible were simply not applicable, such as the lack of evidence of "debilitating, intractable, unrelenting pain," his lack of pain medications, and absence of "pain rehabilitation therapy" or "disuse atrophy or other stigmata of severe and unrelenting pain." (R. 17). The Court notes that Miller was referred to cardiac rehabilitation therapy, a fact not mentioned by the ALJ. (R. 15-18, 248).

In addition to the ALJ's erroneous focus on pain when it was not a central issue of Miller's claim of disability, the ALJ gave reasons for his adverse credibility finding that were not supported by substantial evidence. The most prominent of these errors was his statement that Miller did not have a good work record. (R. 17). Miller testified that he had worked as a plumber for the same employer for 35 years up until his February 2010 bypass surgery. (R. 32). A 35-year work record is obviously a good work record, and it is a factor in Miller's favor. *Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) (prior work history was one factor for ALJ to consider in assessing credibility). The ALJ gave no citation to the record supporting his statement regarding Miller's work record, and it is plainly not supported by substantial evidence.

Another statement that the ALJ did not support with a citation to the record was that Miller had been diet noncompliant. (R. 17). Miller testified that he was not on a special diet and that he had not been prescribed a diet. (R. 44). He then said that he had changed his diet to reduce fried foods and foods high in cholesterol after his bypass surgery. (R. 45, 52-53). Other than stating that Miller had been diet noncompliant, the ALJ did not explain this reason in any detail. (R. 17). He combined diet noncompliance with a reference to smoking, stating that Miller had been "diet and behavior noncompliant with continued, albeit reduced, smoking." *Id.* He then gave three references to the record. *Id.* The first reference, page 12 of Exhibit 1F, is patently

inapplicable because it is a treatment record from 2008, two years before the relevant time period, and the undersigned sees no reference to noncompliance of any kind. (R. 235). The second reference, page 2 of Exhibit 17F, is from Miller's January 13, 2012 appointment with Dr. Miller at Grand Lake Mental Health Center. (R. 453). The notes state that Dr. Miller "[e]ncouraged wellness/smoke cessation/caffeine reduction/sleep/healthy diet/exercise as tolerated/vocational rehab consideration." *Id.* This vague reference to "healthy diet" is not specific enough to stand as substantial evidence that Miller was noncompliant. The third reference, page 3 of Exhibit 21F, is a record of a nurse check with Miller in February 2012. (R. 493). The undersigned sees no reference to diet or to compliance, but a note states that Miller was "not interested in quitline referral at this time." *Id.* Thus, the ALJ's reason of diet noncompliance by Miller is not supported by substantial evidence.

Miller admitted that he had been noncompliant regarding total cessation of smoking. (R. 40-41). Continued smoking after a doctor has recommended cessation can be one legitimate factor supporting an adverse credibility finding. *See, e.g., Andersen v. Colvin*, 541 Fed. Appx. 842, 847 (10th Cir. 2013) (unpublished); *Holbrook v. Colvin*, 521 Fed. Appx. 658, 663 (10th Cir. 2013) (unpublished); *Kruse v. Astrue*, 436 Fed. Appx. 879, 885 (10th Cir. 2011) (unpublished). At least twice, however, the Tenth Circuit has noted that an ALJ's credibility assessment was based on more than tobacco noncompliance. *See Cowan v. Astrue*, 552 F.3d 1182, 1191 (10th Cir. 2008); *Brown v. Barnhart*, 47 Fed. Appx. 864, 866 (10th Cir. 2002) (unpublished). Given the other errors made by the ALJ in his credibility assessment as discussed above, the undersigned finds that the one legitimate factor of tobacco noncompliance tied to substantial evidence is not legally sufficient to support his credibility finding. The Court therefore **REVERSES and REMANDS** the ALJ's decision for further consideration.

**Conclusion**

The Court takes no position on the merits of Miller's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because this case is reversed based on the inadequacy of the ALJ's credibility assessment, the undersigned declines to discuss Miller's other asserted appeal issues. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Miller.

Based on the foregoing, the decision of the Commissioner denying disability benefits to Claimant is **REVERSED AND REMANDED.**

Dated this 23rd day of February 2015.

_____
Paul J. Cleary
United States Magistrate Judge